OPINION. Tukner, Judge: For purposes of discussion and disposition the issues may be divided into three groups: (1) The ownership of the income from the gambling ventures; (2) the deductions claimed on the partnership return of Rex Operators; and (3) certain deductions claimed on the individual returns. The interests in the income from Rex Operators attributed to Stralla and Basom are the same interests, namely, 32½ per cent of the total distributable income of Rex Operators. That attributed to Louis Stralla, Madeline Stralla, and Daisy Stralla are lesser parts of this same 32½ per cent. .At the trial and on brief, the respondent’s primary claim was that the entire 32½ per cent of the profits of Rex Operators was the income of A. C. Stralla and not that of Basom, Louis Stralla, Madeline Stralla, and Daisy Stralla. In the alternative, he takes the position that all of such income not determined to be that of A. C. Stralla was the income of Basom. It is the claim of the petitioners that A. C. or Tony Stralla owned no participating interest in the profits of Rex Operators and that the 32½ per cent interests here in question belonged to the individuals, as shown on the partnership return of Rex Operators. The petitioners rely chiefly on the testimony of Lloyd, Stralla, and Grange and on certain book accounts of Rex Operators. Neither Basom, Madeline Stralla, nor Daisy Stralla testified, although Basom was present in the courtroom during most, if not all, of the trial. It was the testimony of Lloyd, Tony Stralla, and Grange that the participating interests in Rex Operators were as shown by the partnership return and that they were not in any way related or comparable to the percentages of stock ownership in Rex, Inc., the corporation which owned the ship. Grange was not an employee of Rex Operators from the beginning of operation, but at first was helping out. After spending approximately two weeks on the Rex, he agreed to accept employment if he was given an interest in the operations. He was told he could have an interest of 4 per cent, and thereafter he was an employee of Rex Operators on that basis. As to the ownership of the participating interests, it is apparent that he had no direct knowledge. He did not make the distributions, and it is apparent that any detailed information claimed by him was acquired after operations had ceased and most of the money had been distributed. When the revenue agent was on the ship, in September of 1939, Grange knew practically nothing about the participating interests in Rex Operators and such information as he did have resembled to no substantial extent the data later recorded by him on the individual accounts at or about December 9,1939. Both A. C. Stralla and Lloyd were old hands in the conduct of illegal enterprises. Stralla, in 1929, had entered a plea of guilty, was fined $4,500 and sentenced to two years in the Federal penitentiary for violation of the Tariff Act of 1922, conspiracy to violate section 593 of the act and conspiracy to violate the Prohibition Act of October 28, 1918. Lloyd entered a plea of guilty to violation of the National Prohibition Act and, on January 15, 1929, was sentenced to serve a term of one year’s imprisonment, which sentence was suspended, subject to certain conditions. Stralla, with Basom, had at an earlier date been engaged in opening up and operating an illegal distillery in Culver City, California, the distillery being designed to give the impression that it was an oil refinery. The demeanor of Lloyd and Stralla on the witness stand, the responses, particularly those of Stralla, to questions, and the impressions gained from their testimony render such testimony of little value, except such as may be in the nature of admissions against interests or may be subject to some check or verification from other evidence of record. The sequence of events leading up to the organization of Rex, Inc., and Rex Operators, and throughout the gambling operations, leads us to the conclusion that Basom and Tony Stralla had been for some time, and were, operating more or less on a joint basis. They had been engaged in the construction of an illegal distillery at Culver City. After repeal, using Basom as the front, since he had had no trouble with Federal authorities, they acquired a permit to build and operate a distillery. Through some transaction involving distillery' stock, they had acquired the cargo ship, Tooya. The Tooya had been sold in the spring of 1938 and the proceeds, amounting to $42,750, were deposited in a bank account on which Basom and Stralla could draw. The withdrawals, so far as shown, were by Stralla, and the most substantial sums were used as payments to Ben Krakour, who was the original secretary of Rex, Inc., and was shown as representing certain “Eastern” participants in both Rex, Inc., and Rex Operators. Krakour and his eastern associates were bought out of the ventures some time in 1938. From the record, it would appear that the effective date was July 24,1938, when the interests of Rex Operators were changed and the second joint venture began. It was at or about this time that Basom purported to make various generous gifts of participating interests to Tony Stralla’s brother Louis, his mother Madeline, and his former wife Daisy, none of whom are shown to have made any contributions whatever to the partnership capital or the gambling bank roll, other than the 2½ per cent interest originally acquired and owned by Madeline Stralla. Louis, on the witness stand, admitted that he at no time during either 1938 or 1939 contributed anything. So far as the record discloses, Tony Stralla ran the “show,” except for such minor participation in management as Lloyd may have given. In light of all the circumstances, we do not consider it particularly significant that in so far as the records are concerned Tony Stralla was not shown as having any participating interest in Rex Operators. That the use of Basom as a front was not new, was indicated by the method of applying for the license for the construction of the distillery at or about the time of repeal of prohibition. Stralla also indicated to a revenue agent that, in view of an old case against him, the Government wanted to attach anything he owned and it did him no good, therefore, to own anything. Noting as we do that, as between Tony Stralla and Basom, Stralla is the one who dominates, and looking at various of the facts and circumstances disclosed of record, it might even be reasonable to con-elude that the Government is correct in its primary contention and that the entire participating interest in Eex Operators of 32½ per cent, here involved, actually belonged to- Tony Stralla and that none of it belonged to Basom. We are of the opinion, however, and have concluded from various other facts and circumstances, that Basom and Tony Stralla continued in this venture, as they had in previous ventures, to own and operate their interests under some joint arrangement and that each was an owner, to some extent, in the 32½ per cent interest in Eex Operators, here involved. Basom has reported on his returns the percentages attributed to him on the partnership returns of Eex Operators. By his silence in these proceedings, he admits that much, but through counsel denies any greater amount. The remaining portion of the 32¾ per cent interest was carried in the names of members of Tony Stralla’s family and that of a former wife, to whom, in connection with their divorce, he had agreed to pay over some twenty thousand dollars. No convincing reason has been advanced as to why Basom would give to any of these individuals any participating interest in Eex Operators which actually belonged to him. The same is not true of Tony Stralla, and the entire facts and circumstances of record which are in any way convincing refute any thought that Louis Stralla, Daisy Stralla, and Madeline Stralla were the real owners of such interest. We have accordingly concluded and hold that the percentage interests appearing on the books and returns of Eex Operators as belonging to Louis Stralla, Daisy Stralla, and Madeline Stralla, except 2½ per cent of Madeline Stralla’s interest, belonged to A. C. Stralla. The next group of issues covers deductions claimed on the partnership returns of Eex Operators which were disallowed by the respondent in his determination. These deductions may be placed in three further classifications: (1) Legal fees and expenses aggregating $51,716.97, which amount includes payments described as being made for “public relations”; (2) payments made to the State of California in-settlement of penalties claimed in a suit instituted by the California Eailroad Commission relating to the operation of the water taxis; and (3) a claim of a bad debt of $15,500 owing to Eex Operators by the Santa Monica Pier Co. The legal fees and expenses and the penalties and payments made to the State of California were all in some way connected with the defense or satisfaction of suits or claims bottomed on the unlawful operation of the gambling ship Bex. At no time did the petitioners make any claim that the gambling operations were within the law if the gambling operations aboard the ship were within the jurisdiction of the State of California. There is no contention that the activities were not contrary to the California law if conducted within the boundaries of that state. The petitioners contend that the expenditures were ordinary and necessary expenses in the conduct and operation of the business of Rex Operators and that it matters not for the purpose of deduction in determining net income that the business carried on was unlawful. They rely on Commissioner v. Heininger, 320 U. S. 467. The respondent contends that the Heininger case is not contolling in that the business of Heininger was not unlawful in and of itself, but that only certain practices in carrying it on were banned by law. We think that the position of the respondent is sound. The Supreme Court in the Heininger case did specifically note that Heininger was conducting a lawful business, but that certain practices in its conduct were illegal. It is true that Justice Black pointed out in the opinion of the Court that section 23 (a) contains no express reference to the lawful or unlawful character of the business expenses which are declared to be deductible and, further, that the respondent had admitted in his brief that it was not the purpose of the revenue act to penalize illegal business by taxing gross income instead of net income. Also in the opinion it was stated: “It has never been thought, however, that the mere fact that an expenditure bears a remote relation to an illegal act makes it nondeductible.” The petitioners insist that the statement exactly fits the situation here. They fail to note, however, the preceding statement of the Court to the effect that “The Bureau of Internal Revenue, the Board of Tax Appeals, and the federal courts have from time to time, however, narrowed the generally accepted meaning of the language used in Section 23 (a) in order that tax deduction consequences might not frustrate sharply defined national or state policies proscribing particular types of conduct. A review of the situations which have been held to belong in this category would serve no useful purpose for each case should depend upon its peculiar circumstances. A few examples will suffice to illustrate the principle involved. Where a taxpayer has violated a federal or a state statute and incurred a fine or penalty he has not been permitted a tax deduction for its payment. Similarly, one who has incurred expenses for certain types of lobbying and political pressure activities with a view to influencing federal legislation has been denied a deduction. And a taxpayer who has made payments to an influential party precinct captain in order to obtain a state printing contract has not been allowed to deduct their amount from gross income.” The Court, by footnote, cited with apparent approval decided cases in the categories stated, and at no place did the Court indicate or hold that the decisions were unsound or in conflict in any way with the principles declared in the Heinmger case. Among the cases so cited were Great Northern Railway Co. v. Commissioner, 40 Fed. (2d) 372; Bonnie Bros., Inc., 15 B. T. A. 1231; Burroughs Building Material Co. v. Commissioner, 47 Fed. (2d) 178; Estate of John W. Thompson, 21B. T. A. 568; Textile Mills Securities Corporation v. Commissioner, 314 U. S. 326; and Rugel v. Commissioner, 127 Fed. (2d) 393. Unlike the Eeininger case, the business here carried on, being within the jurisdiction of the State of California as determined by the California courts, was illegal. There was nothing lawful about it. The laws of California prohibit such operations and provide punishment for the operators. The legal proceedings in connection with which the expenditures were made were in no sense proceedings to enforce regulatory provisions of law governing a lawful business. The allowance of the deductions here claimed would be in our opinion “to frustrate sharply defined * * * policies” of the State of California “proscribing” gambling operations. The expenditures here in issue were not made in the actual production of the income; deduction of expenses of that character has been allowed. The expenditures here were made to perpetuate or to assure the continuance of an illegal business, and their deduction, in our opinion, would be contrary to public policy and not within the meaning, purpose, and intent of the statute. The deductibility of payments made with a view to influencing Federal legislation has been passed on specifically by the Supreme Court itself, in Textile Mills Securities Corporation v. Commissioner, supra, wherein the disallowance of such a deduction was approved. The payments to John J. O’Connor fall under the ban there prescribed. Certain amounts are claimed as deductions under the heading “public relations.” So-called public relations expenditures in connection with the conduct of an illegal business would most likely also fall within the ban of Textile Mills Securities Corporation v. Commissioner, supra. In the instant case, however, the proof does not show the nature of the duties which were supposed to be performed, or were performed. The deduction claimed accordingly falls for lack of proof. In addition to the fees specifically paid for services rendered in connection with the suits and proceedings discussed above, Louis Pink was paid $250 per month-for the last six months of 1939.' In his testimony, Pink referred to the $250 payment as a retainer, under which he was to take care of claims for- personal injuries, assault and battery, and the like. He did not, however, with any more definiteness describe any matters actually handled by him thereunder, and there is no showing that his services played any part in the production of income. That the monthly “retainer” for five of the six months did not relate to any income-producing operations then carried on is also indicated by the fact that five of the six months for which the “retainer” was paid were after gambling operations had been closed, and activity was centered primarily on such steps as would defeat the State of California in its efforts to bar operation of the Rex. In addition to the so-called retainer, there was some claim that a fee was paid to Pink in connection with a suit by the County of Los Angeles against Rex Operators and various individuals for personal property taxes, which suit was still pending at the end of 1939. Pink did not remember whether he had received any fee in connection with that suit. Furthermore, it appears from the answer filed by Pink in the proceeding that defense of the proceeding may have been a part of the general effort to establish lack of jurisdiction of the State of California over the Rex, in order that the gambling operations might be resumed. We have already determined that fees paid for such purpose are not deductible. Pink was also shown to have received $450 which, according to the check issued therefor, was for attorney’s fees in “LaVelle and Harris cases.” There is no showing or explanation of the identity of either LaVelle or Harris, and Pink in his testimony denied that the amount represented attorney’s fees, stating that he used the money to settle some matters connected with the individuals named, but did not remember just what they were. With respect to the $708.96 paid to Pink as expenses, the evidence discloses, in so far as the purposes of the expenditures are shown, that the expenses had been incurred by Pink in connection with the jurisdictional suit, the injunction proceeding, and the penalty proceeding by the State of California. On such showing, we are unable to say that any of the amounts so paid to Pink constituted allowable deductions. Respondent’s disallowance of the deductions claimed for legal fees and expenses, penalties, and public relations services is accordingly sustained. The respondent is also sustained in his disallowance of the deduction as a bad debt of the amount of $15,500 owing by the Santa Monica Pier Co. to Rex Operators. The petitioners’ claim falls for failure of proof. The petitioners contend that when their business was closed it necessarily ended the business of the Santa Monica Pier Co. The only proof is a letter written by the president of the company in the taxable year. In that letter it was indicated that there might still be opportunity to pay a part of the indebtedness at a later date, but no investigation was made as to the condition of the finances of the company, its assets, or its ability to obtain new capital. We do not know when, if at any time, the debt became worthless. The deductions claimed by the individual petitioners which have been disallowed by the respondent are items listed as business expenses by Stralla in 1938 and 1939, in the amounts of $3,500 and $4,000, gambling losses by Stralla in 1938 of $4,715, a long term capital loss by Basom in 1939 of $18,700 and a long term capital loss by Madeline Stralla in 1939 of $1,833.33. With respect to the business expenses claimed by Stralla, there is some contention on his part that the money expended was never his, but that of Rex Operators, which he held and disbursed in connection with the gambling venture and that such items were accordingly erroneously included in his gross income. The proof offered is not sufficiently \ definite to substantiate this claim. Neither is the proof sufficient to establish a proper basis for allowing their deduction in computing his net income. A considerable sheaf of bills and other papers were ¡ placed in evidence. With respect to numerous items reflected by such papers, there is not even any basis for arguing that any proof of record establishes a connection with the business of Rex Operators, or any ' other business, which may have been carried on by Stralla himself. ‘ So far as the record discloses, except for the personal statements of r Stralla himself, they may have been personal expenditures. In such state of the record, the “business expense” deductions claimed by ' Stralla are denied. The item of $4,715 was claimed by Stralla in his 1938 return as a gambling loss. The record is no more informative than was Stralla’s 1 return, and, for lack of convincing and substantiating proof of facts ►which would supply basis for allowance of the deduction, his claim with respect thereto is denied. Basom has claimed a long term capital loss for 1939 of $18,700, reported as being the deductible long term capital loss on 255 shares of stock of Rex, Inc. He claimed a cost basis of $28,050 for the 255 shares. The respondent in his determination found that the cost basis, when properly adjusted for 245 shares, was $19,845, and allowed a long term capital loss of $13,230. Both Basom and the respondent started their computations with a cost of $1,100 for each unit of 10 shares. The respondent determined, however, that $29,000 had been returned to the stockholders by way of capital distribution, and reduced Basom’s cost for 245 shares by 24½ per cent of $29,000. It is Basom’s contention that such an adjustment is erroneous in that the $29,000 was distributed to the holders of participating interests in Rex Operators and that there was no connection or relationship between the interests in Rex Operators and the stockholdings in Rex, Inc. He developed on cross-examination of one of respondent’s witnesses, a revenue agent, that the books and accounts of Rex Operators indicated a difference between the stockholders of Rex, Inc., and holders of participating interests in Rex Operators. We have previously noted the manner in which the individual accounts purporting to show the participating interests in Rex Operators appeared on the books. We have also noted the fact that in the beginning the theory was that the holder of each unit of stock should be a participator to the extent of 1 per cent in the gambling operations. That the percentages did, certainly during 1938, follow the ownership of the stock in Rex, Inc., to some extent, is indicated by the listing of percentages and distributions made by Lloyd during the first joint venture. Thereafter there were some changes in the participating interests in Eex Operators. These changes, however, followed upon the heels of the purchase of the stock of the Krakour or “Eastern Interests” in Eex, Inc. We are unable to say on the record, as the peti-, tioners desire us to do, that there was no connection between the holdings in Eex, Inc., and Eex Operators and that there was no return of capital to the stockholders in Eex, Inc. There is a further discrep- j ancy in Basom’s case with respect to his stock in Eex, Inc, The proof j shows that on December 19, 1939, he was the record holder of 352½ shares. He reported a short term capital loss on 112½ of these shares.' If the stock records are correct and he properly reported his loss on1 the 112½ shares, he had left only 240 shares instead of the 255 shares, claimed by him and the 245 shares allowed to him by respondent in his determination of the deficiency. Such being the state of the record,’ we are unable to say that Basom is entitled to a greater long term' capital loss deduction than was allowed by the respondent. j The same method of computation was applied in determining peti- ¡ tioner Madeline Stralla’s long term capital loss on her 25 shares of i stock. Her claim of error in the respondent’s determination also falls 1 for lack of proof. 3 Eeviewed by the Court. Decision will be entered umder Rule 50.'