RAFAEL BUSCAGLIA, TREASURER OF PUERTO RICO, Petitioner, v. TAX COURT OF PUERTO RICO, Respondent; FAJARDO SUGAR CO. OF P. R., Intervener.

No. 166.    Argued May 3, 1948.—Decided June 1, 1948.

*Luis Negrón Fernández, Attorney General,* and *Edgar S. Belaval,* special counsel for the Department of Justice, for petitioner. *Sifre, Franceschi & Sifre* for intervener, respondent in the main action.

MR. JUSTICE SNYDER delivered the opinion of the Court.

The People of Puerto Rico filed *quo warranto* proceedings against the Fajardo Sugar Company of Porto Rico, the Fajardo Sugar Growers Association and Loíza Sugar Company for alleged violations of Federal and insular laws prohibiting corporations from owning and controlling more than 500 acres of agricultural land. The question here is whether the Tax Court erred in holding that the fees paid by the Fajardo Sugar Company to attorneys who conducted its defense in

the *quo warranto* case are deductible from its gross income under § 32(a)(1) of the Income Tax Act as ordinary and necessary expenses incurred in carrying on its business.[1]

██ Attorney's fees directly connected with or proximately resulting from the business of a taxpayer are deductible under § 32(a)(1). *Kornhauser* v. *United States,* 276 U.S. 145. That problem is not involved in this case, as the Treasurer concedes that these legal expenses were directly connected with the business of the company. In the same way, the Treasurer does not dispute the fact that these expenses were "necessary". The only problem therefore is to determine if they were "ordinary" expenses.

██ In *Welch* v. *Helvering,* 290 U.S. 111, the taxpayer, a former officer of a corporation, was not permitted to deduct payments to the creditors of the corporation after the latter became bankrupt. His purpose in making the payments was to re-establish his credit. The theory of the court was that the payment may have been necessary, but they were not ordinary. In seeking to determine if expenses are ordinary, we are guided by the opinion of Mr. Justice Cardozo in the *Welch* case at pp. 113–115:

"We may assume that the payments to creditors of the Welch Company were necessary for the development of the petitioner's business, at least in the sense that they were appropriate and helpful. *McCulloch* v. *Maryland,* 4 Wheat. 316. He certainly thought they were, and we should be slow to override his judgment. But the problem is not solved when the payments are characterized as necessary. Many necessary payments are charges upon capital. There is need to determine whether they are both necessary and ordinary. Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstances. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the

---

[1] This case involves deficiencies for substantial sums paid in 1936, 1937 and 1938 by the taxpayer as such legal fees. There is no contention that the fees were unreasonable or were not paid in good faith. Nor does the Treasurer dispute (a) the distribution of the fees over these three years or (b) the fact that the fees accrued during those years.

same taxpayer will have to make them often. *A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack.* Cf. *Kornhauser* v. *United States,* 276 U.S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type.

". . . Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." (Italics ours).

The above-quoted language, particularly the italicized portion, seems at first blush decisive in favor of the deductibility of the legal fees herein. However, the test laid down in the *Welch* case is not the only factor in determining the deductibility of expenses under § 32(a)(1). The cases establish an additional requirement: such deductions are not permitted if they would "frustrate sharply defined national or state policies proscribing particular types of conduct." *Commissioner* v. *Heininger,* 320 U.S. 467, 473.

The latter rule has been applied in cases where taxpayers attempted to deduct fines or penalties they paid for violations of law. Apart from the fact that such fines or penalties were avoidable and therefore had no necessary connection with the operation of a business, their allowance, according to the cases, would be against public policy. *Jerry Rossman Corp.* v. *Commissioner,* 10 T.C. No. 60 (March 19, 1948); *Great Northern Ry. Co.* v. *Com'r of Internal Revenue,* 40 F.(2) 372 (C.C.A. 8th, 1930), cert. denied 282 U.S. 855; *Helvering* v. *Superior Wines & Liquors,* 134 F.(2) 373 (C.C.A. 8th, 1943); *Commissioner of Int. Rev.* v. *Longhorn Portland*

*Cem. Co.,* 148 F.(2) 276 (C.C.A. 5th, 1945), cert. denied 326 U.S. 728. As the Circuit Court put it in the *Longhorn* case at p. 277: "The sense of the rule that statutory penalties are not deductible from gross income is that the penalty is a punishment inflicted by the state upon those who commit acts violative of the fixed public policy of the sovereign, wherefore to permit the violator to gain a tax advantage through deducting the amount of the penalty as a business expense, and thus to mitigate the degree of his punishment, would frustrate the purpose and effectiveness of that public policy."

This question of public policy must also be considered with reference to legal fees incurred by a taxpayer in defending himself against criminal charges. If the charges are not connected with or proximately resulting from the business of the taxpayer, they are not deductible. *Pantages Theater Co.* v. *Welch,* 71 F.(2) 68 (C.C.A. 9th, 1934) (taxpayer's president acquitted of rape charge made by a prospective performer); *George L. Rickard* v. *Commissioner,* 12 B.T.A. 836. But if they meet the latter test, they are deductible if the taxpayer is acquitted. To deny deduction under those circumstances would be to impose an unjustified penalty on a defendant who by virtue of his innocence is entitled to a verdict of acquittal free of any penalty. *Commissioner of Int. Rev.* v. *People's-Pittsburgh Trust Co.,* 60 F.(2) 187 (C.C.A. 3rd, 1932); *Commissioner of Internal Rev.* v. *Continental Screen Co.,* 58 F.(2) 625 (C.C.A. 6th, 1932); *Hal Price Headley* v. *Commissioner,* 37 B.T.A. 738.

However, the problem is more difficult where, although the criminal charge is connected with the taxpayer's business. the latter is convicted. No case squarely in point has reached the Supreme Court of the United States. The closest case is *Commissioner* v. *Heininger, supra.* In the *Heininger* case the Postmaster General issued a fraud order against a dentist who sold false teeth by mail. This order in practical result forbade the dentist from using the mails for his business. If it remained in effect, it would destroy the dentist's business.

The latter sought an injunction against the order in the courts, where the issue was finally decided against him. The Commissioner disallowed the deductions of legal expenses which the dentist incurred in his unsuccessful injunction suit. The Board of Tax Appeals affirmed this ruling of the Commissioner, 47 B.T.A. 95. The Circuit Court of Appeals reversed the Board and allowed the deductions, 133 F.(2) 567. The Supreme Court affirmed the judgment of the Circuit Court.[2]

The *Heininger* case is not a holding that reasonable fees paid in good faith for defense against charges which are criminal in nature are deductible even if the defense is unsuccessful. That case deals with a narrow situation and the court carefully refrains from sweeping generalities. 4 Mertens, Law of Federal Income Taxation, 1947 Supplement, § 25.36, p. 152. The court points out at p. 473, footnote 8, that in *Estate of Thompson* v. *Commissioner*, 21 B.T.A. 568, and *Burroughs Bldg. Material Co.* v. *Commissioner*, 47 F.(2) 178 (C.C.A. 2nd, 1931), taxpayers convicted of crimes were not permitted to deduct their attorney's fees. But it neither expressly approves nor disapproves of these cases. Instead it confines itself to the facts of the *Heininger* case. And after emphasizing the fact that in the case before it the fees were expended by the taxpayer to avoid complete destruction of his business, the court says at pp. 474–5:

"If the respondent's litigation expenses are to be denied deduction, it must be because allowance of the deduction would frustrate the sharply defined policies of 39 U.S.C. §§ 259 and 732 which authorize the Postmaster General to issue fraud orders. The single policy of these sections is to protect the public from fraudulent practices committed through the use of the mails. It is not their

---

[2] Although some of the earlier cases are now obsolete by virtue of the *Heininger* case, the cases on this question are collected in Annotation, Federal income tax: deductibility of legal expenses, 88 L.ed. 177. See also, Plumb, Income Tax on Gains and Losses in Litigation, 26 Cornell L.Q. 16, 64–65; Lynch, Legal Expenses as Deductions from Income, 12 Fordh.L.Rev. 8, 13–21; Annotation, 104 A.L.R. 680, 683.

policy to impose personal punishment on violators; such punishment is provided by separate statute, and can be imposed only in a judicial proceeding in which the accused has the benefit of constitutional and statutory safeguards appropriate to trial for a crime. Nor is it their policy to deter persons accused of violating their terms from employing counsel to assist in presenting a bona fide defense to a proposed fraud order. It follows that to allow the deduction of respondent's litigation expenses would not frustrate the policy of these statutes; and to deny the deduction would attach a serious punitive consequence to the Postmaster General's finding which Congress has not expressly or impliedly indicated should result from such a finding. . . . ."

In a recent article on this problem a commentator concedes that if a taxpayer were allowed to deduct fines and penalties as ordinary and necessary expenses incurred in carrying on his business, the deterrent effects of such fines and penalties **would be mitigated and public policy frustrated.** But he argues that "Legal expenses are not penalties prescribed by law. . . . To allow a deduction for legal expenditures does not lessen the deterrent effect of a penalty or fine or support undesirable behavior. On the contrary, it is the public policy of this land that a person should have full benefit of counsel. No public policy is frustrated by a deduction for counsel fees, and the disallowance of this deduction because of this inapplicable doctrine is in effect a blow at the element of fair and reasonable counsel in our concept of due process." Krassner, "Can a Deduction for Legal Fees Be Against Public Policy?", 26 Taxes 447, 448 (May, 1948). See also 54 Harv. L. Rev. 852, 854–6; 57 Harv. L. Rev. 109.

In his article Krassner disapproves of *Stralla* v. *Commissioner,* 9 T.C. 801, where the Federal Tax Court disallowed deductions for legal fees in connection with an appeal to determine whether the State of California had jurisdiction over a gambling business aboard ship. If California lacked jurisdiction, the gambling business was legal; if the State had jurisdiction, the business was illegal. Although the Tax Court recognized that the legal fees were directly connected

with or proximately resulting from the business, they were disallowed because their allowance, in the Tax Court's opinion, would have frustrated sharply defined state policies. Krassner, on the other hand asserts that (p. 449) "to deny such deductions on the ground that otherwise public policy would be thwarted, is to thwart public policy" that a person shall have full benefit of counsel.

It should also be noted that the Tax Court has held that salaries and other operating expenses related to an illegal business such as gambling are allowable deductions. The court characterized these items as "legitimate expenses of an illegitimate business". It distinguished these expenses from payments made to obtain "protection" from arrest and prosecution. The latter were disallowed on the ground of public policy. *Gomeaux* v. *Commissioner,* 10 T.C. No. 29. And in *Commissioner* v. *Heininger, supra,* the court said at p. 474; "It has never been thought however, that the mere fact that an expenditure bears a remote relation to an illegal act makes it non-deductible. The language of § 23(*a*) [our § 32(a)(1)] contains no express reference to the lawful or unlawful character of the business expenses which are declared to be deductible. And the brief of the government in the instant case expressly disclaims any contention that the purpose of tax laws is to penalize illegal business by taxing gross instead of net income. Cf. *United States* v. *Sullivan,* 274 U.S. 259."

These Tax Court cases and this particular language of the Supreme Court perhaps support Krassner's position. The argument would be somewhat as follows: if it is not against public policy to permit deductions of legitimate expenses in an illegal business, why should it be against public policy to permit deductions of legitimate expenses incurred in an unsuccessful defense by a taxpayer against a criminal charge relating to his business? However, the view we take of this case makes it unnecessary to decide if the taxpayer may deduct such legal expenses. We therefore expressly leave this question open.

This last question is left open because the instant case does not involve fees expended in an unsuccessful defense of a criminal case. We assume, without deciding, that the *quo warranto* proceeding involved herein has sufficient criminal features to warrant its characterization for present purposes as a criminal case. Cf. *People* v. *Henneman,* 60 P.R.R. 58, 63. But analysis of this particular proceeding does not sustain the conclusion that the disposition thereof was equivalent or even analogous to conviction in a criminal case.

On January 24, 1936 The People of Puerto Rico filed a *quo warranto* proceeding in this Court against this taxpayer and two other entities alleging violation of Joint Resolution No. 23 of Congress, approved May 1, 1900, 31 Stat. 716, 48 U.S.C.A. § 752, which prohibits ownership and control by corporations of agricultural lands in excess of 500 acres. The People of Puerto Rico prayed among other things for forfeiture of the franchise of the Fajardo Sugar Co., its immediate dissolution, an order prohibiting it from doing business in Puerto Rico and a fine.

After lengthy preliminary proceedings not necessary to detail here, on June 18, 1945 a consent decree was entered in this *quo warranto* proceeding. The decree recited that this Court has jurisdiction of the proceedings and of all the parties; that the information states cause of action against the defendants; and that "By consenting to the entry of this decree defendants do not admit, save for purposes of this decree only, any allegation, statement of fact or conclusion of law contained in the petition herein. Neither do defendants, save for purposes of this decree only, admit the validity and legality of the Puerto Rican Land Law."

The decree provided for sale by the Fajardo Sugar Growers Association and Loíza Sugar Co. of all their agricultural lands, except for a small amount, to the Land Authority for the fair value thereof within 3 years or any agreed extension. During this period the Fajardo Sugar Growers Association

was entitled to engage in agricultural activities in connection with the lands. The proceeding was suspended for a period of 3 years or any agreed extension. If the Land Authority elected not to purchase the land within this period, all obligations under the decree would terminate and the parties would be returned to the positions they took prior to entry of the decree.

The decree further provided that "no fine, costs or attorney's fees shall be imposed upon or paid by any defendants herein". Finally, it recited that "If and when all the lands . . . are sold and transferred to the land Authority . . . this suit and all controversies and issues involved therein shall be deemed to be finally disposed of by this Consent. Decree and this suit will then be ended."

██ Contrary to the contention of the Treasurer that there is nothing before us to enable us to determine if the consent decree has been carried out, we take judicial notice of the subsequent proceedings in the *quo warranto* proceeding which show that the Land Authority elected to purchase the lands covered by the consent decree; the parties agreed on the valuation thereof; and on June 5, 1947 this Court entered an order providing for delivery of the lands to the Land Authority, payment of the purchase price by the Authority to the vendors and execution of a deed by the latter in favor of the Authority.

It is not for us to say at this time whether the taxpayer would have prevailed in the numerous defenses it and the other defendants raised in the *quo warranto* proceeding prior to entry of the consent decree. For reasons of their own both parties decided not to press these issues and made the *quo warranto* proceeding as such academic by virtue of their agreement, which was carried out, for sale of the lands in question to the Land Authority. No liability was admitted, no penalties were imposed, and no corporate franchise was revoked. The companies voluntarily sold the lands to the

Land Authority at prices satisfactory to the vendors. And nothing substantial remains to be done by this Court except to enter an order formally closing the proceeding.

The case which bears the closest resemblance to the instant case is *Longhorn Co.* v. *Commissioner*, 3 T.C. 310, 148 F.(2) 276, cert. denied 326 U.S. 728, which was decided subsequent to and in the light of the *Heininger* case. The issue there was the deductibility of (1) attorney's fees and (2) amounts paid to the state by the defendant in compromise of a suit by the state to recover penalties for violation of the state anti-trust law. The taxpayer paid item (2) as a compromise to avoid the expense, inconvenience and publicity of litigation. The judgment recited that this payment was not to be construed as an admission of any violation.

The Tax Court allowed deduction of both items (1) and (2) as necessary and ordinary expenses. The Commissioner appealed as to item (2). The Circuit Court reversed the decision of the Tax Court as to that item. Its reasoning was that the basic question on this item was not guilt or innocence, but rather that it was (p. 278) "paid as a penalty". To permit its deduction would therefore frustrate a sharply defined public policy against permitting deduction of amounts paid as penalties. To the same effect, *Universal Atlas Cement Co.* v. *Commissioner*, 9 T.C. 971. But for us the importance of the *Longhorn* case is that even the Commissioner conceded that the attorney's fees were properly deductible under the circumstances of that case. He acquiesced in the decision of the Tax Court as to item (1). He petitioned the Circuit Court for review only as to item (2). We thus see that although guilt or innocence is not determinative as to amounts paid as penalties, the failure to establish the defendant's guilt does play a significant role when deductibility of attorney's fees is involved.

In the *quo warranto* proceeding involved herein the guilt of the companies was never established. No money was ever

paid to the government as penalty. The corporate franchise of the taxpayer was not revoked and it was not prohibited from continuing to do business here. Cf. *Puerto Rico* v. *Rubert Co.,* 309 U.S. 543. Without admitting the truth or correctness of the alleged violations, the companies voluntarily sold their lands to a governmental agency. Even in a traditional criminal case, as we have seen in the *Longhorn* case, permitting deductions of legal fees paid to defense counsel, as distinguished from payments to the state as compromise penalties, does not "frustrate sharply defined national or state policies proscribing particular types of conduct" where the case is terminated without a conviction or an admission of the alleged violation and the factors influencing the taxpayer to compromise rather than to litigate constitute practical business consideration and not inferences of guilt. That same principle clearly applies under the facts of this case, and justifies the action of the Tax Court in permitting the deduction of reasonable attorney's fees paid in good faith to attorneys who conducted the defense of the taxpayer in the *quo warranto* proceeding involved herein.

The Treasurer also contends that these fees were capital expenditures and therefore not ordinary business expenses. "Amounts expended to protect and correct title to real property are ordinarily not deductible. Such payments are considered as constituting a part of the cost of the property. Payments in protection of a capital investment are capital expenditures." 4 Mertens, *supra,* § 25.19, pp. 344–45; *Porter Royalty Pool* v. *Commissioner of Internal Rev.,* 165 F.(2) 933 (C.C.A. 6th, 1948). The cases cited by the Treasurer are to the same effect. *Isaac G. Johnson & Co.* v. *United States,* 149 F.(2) 851 (C.C.A. 2nd, 1945); *Burton-Sutton Oil Co.* v. *Commissioner of Int. Rev.,* 150 F.(2) 261 (C.C.A. 5th, 1945); *Jones' Estate* v. *Commissioner of Internal Revenue,* 127 F.(2) 231 (C.C.A. 5th, 1942). But the People have never disputed the title of the companies to the lands

in the technical sense. It never claimed in the *quo warranto* case that if the proceeding were successful and the companies were forced to disgorge their land holdings, the latter would not be entitled to the full and fair value thereof. "It will be noticed that even the People of Puerto Rico when expropriating or selling at public auction the property of a corporation which has violated said Joint Resolution [the five hundred acre law] can not deprive it of the property without paying compensation pursuant to the provisions of the Eminent Domain Act." *Campos* v. *Central Cambalache,* 64 P.R.R. 57, 67–8, affirmed in 157 F.(2) 43 (C.C.A. 1st, 1946). The dispute was therefore not over title to the lands as such. Rather it involved the right of the defendants to conduct a business in which it owned and operated more than five hundred acres of agricultural land. The prayer was for revocation of the taxpayer's franchise and dissolution of its business. In this respect the case is therefore similar to *Commissioner* v. *Heininger, supra,* where the court held that fees paid to resist a suit which if successful would destroy the taxpayer's business were not capital expenditures and were deductible as necessary and ordinary expenses. And see *Pacific Coast Biscuit Co.* v. *Commissioner,* 32 B.T.A. 39.[3]

The decision of the Tax Court will be affirmed.

Mr. Justice De Jesús did not participate herein.

---

[3] Even if we held that these fees were capital expenditures and constituted part of the cost of the lands, that result would furnish little comfort to the Treasurer. As we have seen, these lands were sold to the Land Authority in 1947. The difference between the cost and sales price of the land was therefore apparently taxable to the vendors in that year. But if these fees were added to the cost price of the land, the taxable gain on the sale would be reduced to that extent.