Rafael Buscaglia, Tesorero de Puerto Rico, peticionario, *v.* Tribunal de Contribuciones de Puerto Rico, demandado; Fajardo Sugar Co. of P. R., interventora.

Núm. 166.—*Sometido:* Mayo 3, 1948. *Resuelto:* Junio 1, 1948.

*Hon. Procurador General Luis Negrón Fernández y Edgar S. Belaval,*
abogado especial éste del Departamento de Justicia, abogados del
peticionario; *Sifre, Franceschi & Sifre,* abogados de la interven-
tora, querellante en el pleito principal.

El Juez Asociado Señor Snyder emitió la opinión del tri-
bunal.

El Pueblo de Puerto Rico instituyó procedimiento de
*quo warranto* contra Fajardo Sugar Co. of Porto Rico, Fa-
jardo Sugar Growers Association y Loíza Sugar Company
por supuestas infracciones de las leyes Federal e insula-
res, que prohiben a las corporaciones ser dueñas de y con-
trolar más de 500 acres de terrenos de labrantío. La cues-
tión envuelta en este caso es si el Tribunal de Contribucio-
nes cometió error al resolver que los honorarios pagados por
la Fajardo Sugar Company a los abogados que la represen-
taron en el recurso de *quo warranto,* son deducibles de su
ingreso bruto bajo la sección 32(*a*) (1) de la Ley de Contri-
buciones sobre Ingresos como gastos ordinarios y necesa-
rios incurridos en la explotación de su negocio.([1])

█ Bajo la sección 32(*a*) (1) los honorarios de abogado
relacionados directamente con o que provienen de manera
próxima (*proximately*) del negocio de un contribuyente, son
deducibles. *Kornhauser* v. *United States,* 276 U.S. 145. En
este caso no está envuelto dicho problema, ya que el Teso-
rero admite que estos gastos de abogado estaban relaciona-
dos directamente con el negocio de la compañía. En igual
forma, el Tesorero no niega el hecho de que estos desembol-
sos fueron "necesarios". Por consiguiente, el único pro-
blema es determinar si fueron gastos "ordinarios".

█ En *Welch* v. *Helvering,* 290 U.S. 111, al contribu-
yente, un ex oficial de una corporación, no le fué permitido

---

([1])Este caso envuelve deficiencias por sumas considerables pagadas en 1936,
1937 y 1938 por la contribuyente como tales honorarios de abogado. No se alega
que los honorarios eran irrazonables o que no se pagaron de buena fe. Tampoco
discute el Tesorero (*a*) la distribución de los honorarios entre estos tres años o
(*b*) el hecho de que los honorarios se devengaron durante dichos años.

deducir los pagos a los acreedores de ella después de haberse declarado en quiebra. El fin que perseguía al realizar los pagos fué restablecer su crédito. La teoría de la corte fué que los pagos pudieron haber sido necesarios, pero no eran ordinarios. Al tratar de determinar si cualesquiera gastos son ordinarios, nos sirve de guía la opinión del Juez Cardozo en el caso de *Welch,* a las págs. 113–115:

"Podemos suponer que los pagos hechos a los acreedores de la Compañía Welch fueron necesarios para el desarrollo del negocio del peticionario, por lo menos en el sentido de que fueron propios y de alguna ayuda. *McCulloch v. Maryland,* 4 Wheat. 316. Ciertámente creyó que lo eran y no debemos apresurarnos a revocar su criterio. Pero el problema no se resuelve cuando se caracteriza a los pagos como necesarios. Muchos pagos necesarios constituyen cargos al capital. Urge determinar si son necesarios y también ordinarios. Ahora, lo que es ordinario, aunque siempre debe tener en sí un indicio de constancia, es sin embargo una cosa variable afectada por el tiempo, lugar y las circunstancias. La palabra ordinario en esta acepción no significa que los pagos deben ser habituales o normales en el sentido de que el mismo contribuyente tiene que desembolsarlos a menudo. *Un litigio que afecte la seguridad de un negocio puede ocurrir una vez en la vida. Los honorarios de abogado podrán ser tan elevados que no sería probable que se pagaran por segunda vez. No por esto el gasto deja de ser uno ordinario, ya que sabemos por experiencia propia que los pagos a tal fin, ya sean elevados o insignificantes, son el medio común y aceptado por todos de repeler el ataque.* Cf. Kornhauser v. United States, 276 U.S. 145. La situación es única en la vida del individuo afectado, pero no en la vida del grupo, la comunidad, de la cual forma parte. En esos momentos hay normas de conducta que ayudan a formar nuestro criterio haciéndolo seguro y objetivo. Las partidas de gastos no son clasificadas arbitrariamente, sino mediante una norma definida.

" . . . Aquí, en verdad, según ocurre frecuentemente en otras ramas del derecho, las distinciones decisivas son en cuanto a grado y no en cuanto a naturaleza. Nos esforzamos en vano por hallar una fórmula verbal que suministre la clave infalible. El criterio establecido por la ley no es una doctrina de derecho; más bien es un método de vida. La vida en todos sus aspectos debe descifrarnos el enigma." (Bastardillas nuestras).

El lenguaje antes citado, particularmente la parte en bastardillas, parece a primera vista decisivo a favor de la deducibilidad de los honorarios de abogado aquí envueltos. Sin embargo, la fórmula establecida en el caso de *Welch* no es el único factor a tenerse en cuenta al determinar la deducibilidad de gastos bajo la sección 32(*a*) (1). Los casos establecen un requisito adicional: tales deducciones no son permitidas si vienen a "frustrar políticas nacionales o estatales específicamente definidas que proscriben determinados tipos de conducta". *Commissioner* v. *Heininger*, 320 U.S. 467, 473.

Esta última regla ha sido aplicada en casos donde los contribuyentes trataron de deducir en sus planillas multas o penalidades pagadas por infracciones a la ley. Aparte del hecho de que tales multas o penalidades se pudieron evitar y por tanto no estaban relacionadas necesariamente con la explotación de un negocio, su deducción, según la jurisprudencia, sería en contra de la política pública. *Jerry Rossman Corp.* v. *Commissioner*, 10 T.C. Núm. 60 (19 de marzo de 1948); *Great Northern Ry. Co.* v. *Com'r of Internal Revenue*, 40 F.2d 372 (C.C.A. 8, 1930), *cert.* denegado 282 U.S. 855; *Helvering* v. *Superior Wines & Liquors*, 134 F.2d 373 (C.C.A. 8, 1943); *Commissioner of Int. Rev.* v. *Longhorn Portland Cem. Co.*, 148 F.2d 276 (C.C.A. 5, 1945), cert. denegado 326 U.S. 728. Según lo indica la Corte de Circuito en el caso de *Longhorn* a la pág. 277: "El alcance de la regla de que las penalidades estatutarias no son deducibles del ingreso bruto es que la penalidad es un castigo del estado a aquél que realiza actos en contra de la política pública establecida del soberano, y en consecuencia, el permitirle al delincuente que obtenga una ventaja contributiva deduciendo el importe de la penalidad como un gasto del negocio, y en esa formar mitigar la severidad de su castigo, frustraría el propósito y la efectividad de dicha política pública."

Esta cuestión de política pública también debe considerarse en relación con honorarios de abogado incurridos por un contribuyente al defenderse en una causa criminal. Si los hechos que se le imputan no están relacionados con o provienen de manera próxima del negocio del contribuyente, aquéllos no son deducibles. *Pantages Theatre Co.* v. *Welch,* 71 F.2d 68 (C.C.A. 9, 1934) (el presidente de la contribuyente declarado absuelto de una acusación de violación héchale por una pretensa artista); *Rickard* v. *Commissioner,* 12 B.T.A. 836. Pero si cumplen con la última fórmula, son deducibles si el contribuyente es absuelto. El negar la deducción bajo dichas circunstancias sería imponer una penalidad injustificada a un acusado que, en virtud de su inocencia, tiene derecho a un veredicto absolutorio libre de toda penalidad. *Commissioner of Int. Rev.* v. *People's-Pittsburgh Trust Co.,* 60 F.2d 187 (C.C.A. 3, 1932); *Commissioner of Internal Rev.* v. *Continental Screen Co.,* 58 F2d. 625 (C.C.A. 6, 1932); *Headley* v. *Commissioner,* 37 B.T.A. 738.

Sin embargo, el problema es más difícil cuando, si bien la acusación penal está relacionada con el negocio del contribuyente, éste es declarado culpable. Al Tribunal Supremo de los Estados Unidos no ha llegado un caso de estricta aplicación. El que más se le asemeja es el de *Commissioner* v. *Heininger,* supra. En dicho caso el Administrador General de Correos expidió una orden de fraude contra un dentista que vendía dientes postizos por correo. Esta orden en efecto práctico prohibía al dentista usar el correo en su negocio. De permanecer en vigor, le destruiría el negocio al dentista. Éste solicitó ante los tribunales un *injunction* contra la referida orden, decidiéndose finalmente la cuestión en su contra. El Comisionado rechazó las deducciones por honorarios de abogado incurridos por el dentista en su infructuoso recurso de injunction. La Junta de Apelaciones Contributivas confirmó esta decisión del Comisionado, 47 B.T.A. 95. La Corte de Circuito de Apelacio-

nes revocó a la Junta y permitió las deducciones, 133 F.2d 567. La Corte Suprema confirmó la sentencia de la Corte de Circuito.(²)

El caso de *Heininger* no es una decisión de que honorarios razonables pagados de buena fe por la defensa contra imputaciones de naturaleza penal, son deducibles aun cuando la defensa sea infructuosa. Dicho caso trata de una situación muy limitada y la corte cuidadosamente se abstiene de hacer manifestaciones abarcadoras. 4 Mertens, *Law of Federal Income Taxation*, Suplemento 1947, sec. 25.36, pág. 152. La corte indica a la pág. 473, escolio 8, que en *Estate of Thompson* v. *Commissioner*, 21 B.T.A. 568, y *Burroughs Bldg. Material Co.* v. *Commissioner*, 47 F.2d 178 (C.C.A. 2, 1931), a los contribuyentes convictos de crímenes no se les permitió deducir sus honorarios de abogado. Pero la corte ni aprueba ni desaprueba expresamente estos casos. Más bien se limita a los hechos del caso de *Heininger*. Y después de hacer hincapié en el hecho de que en el caso ante ella el contribuyente pagó los honorarios para evitar la completa destrucción de su negocio, la corte dijo a las págs. 474-5:

"Si se va a denegar la deducción de los gastos de litigación del recurrido, tiene que ser debido a que la aprobación de tal deducción frustraría las políticas específicamente definidas de 39 U.S.C. Secciones 259 y 732 que autorizan al Administrador General de Correos a expedir órdenes de fraude. La sola política de estas secciones es proteger al público de prácticas fraudulentas cometidas mediante el uso del correo. No es su política imponer castigo personal a los infractores; tal castigo está provisto por una ley separada, y sólo puede imponerse en un procedimiento judicial en que el acusado tenga el beneficio de las salvaguardas constitucionales y estatutarias propias para un juicio penal. Tampoco es su política disuadir a

(²) Si bien algunos de los casos anteriores están ahora obsoletos en virtud del caso de *Heininger*, los casos sobre esta cuestión están coleccionados en *Annotation, Federal income tax: deductibility of legal expenses*, 88 L. ed. 177. Véanse también, Plumb, *Income Tax on Gains and Losses in Litigation*, 26 Cornell L. Q. 16, 64–65; Lynch, *Legal Expenses as Deductions from Income*, 12 Fordh. L. Rev. 8, 13–21; *Annotation*, 104 A.L.R. 680, 683.

las personas acusadas de violar sus disposiciones que no empleen abogados para que les ayuden a presentar una defensa *bona fide* contra una propuesta orden de fraude. De ahí surge que el permitir la deducción de los gastos de litigación del recurrido no frustraría la política de estos estatutos; y el rechazar la deducción añadiría una seria consecuencia punitiva a la orden del Administrador General de Correos, la cual el Congreso ni expresa ni implícitamente ha indicado debe venir como resultado de tal orden. . . . "

En un reciente artículo sobre este problema, un comentarista admite que si se permitiera a un contribuyente deducir las multas y penalidades como gastos ordinarios y necesarios incurridos en la explotación de su negocio, los efectos disuasivos de tales multas o penalidades serían mitigados y se frustraría la política pública. Pero arguye que "Los honorarios de abogado no son penalidades prescritas por ley. . . . El permitir una deducción por desembolsos legales no disminuye el efecto disuasivo de una penalidad o multa ni estimula conducta indeseable. Por el contrario, la política pública de este país es que una persona debe tener el beneficio completo de abogado. Mediante la deducción de honorarios de abogado no se frustra política pública alguna, y el rechazo de esta deducción, con motivo de esta doctrina inaplicable, constituye en efecto un golpe al elemento de consejo legal justo y razonable que entraña el concepto del debido procedimiento." Krassner, *"Can a Deduction for Legal Fees Be Against Public Policy?"*, 26 *Taxes* 447, 448 (mayo, 1948). Véanse también 54 *Harv. L. Rev.* 852, 854-6; 57 *Harv. L. Rev.* 109.

En este artículo, Krassner no aprueba el caso de *Stralla* v. *Commissioner*, 9 T.C. 801, donde la Corte Federal de Contribuciones rechazó deducciones por honorarios de abogado en relación con una apelación para determinar si el Estado de California tenía jurisdicción sobre un negocio de juego radicado a bordo de un barco. Si Califonia carecía de jurisdicción, el negocio era legal; si el Estado tenía jurisdicción, el negocio era ilegal. Si bien la Corte de Contribucio-

nes reconoció que los honorarios de abogado estaban directamente relacionados con o provenían de manera próxima del negocio, éstos fueron rechazados porque su admisión, en opinión de la Corte, hubiera frustrado políticas estatales específicamente definidas. Krassner, por otro lado, afirma que (pág. 449) "el rechazar tales deducciones por el fundamento de que de otro modo se frustraría la política pública, equivaldría a frustrar la política pública" al efecto de que una persona debe tener ayuda completa de abogado.

También es de notar que la Corte de Contribuciones ha resuelto que los sueldos y otros gastos de explotación relacionados con un negocio ilegal como el juego, son deducciones permisibles. La Corte caracterizó estas partidas como "gastos legítimos de un negocio ilegítimo". Distinguió estos gastos de los pagos hechos para obtener "protección" contra arresto y acusación. Estos fueron rechazados por el fundamento de política pública. *Comeaux* v. *Commissioner*, 10 T.C. Núm. 29. Y en el caso de *Commissioner* v. *Heininger*, supra, la corte dijo a la pág. 474: "Nunca se ha pensado, sin embargo, que por el mero hecho de que un desembolso tenga una lejana relación con un acto ilegal, dicho desembolso no sea deducible. El lenguaje de la sección 23(*a*) [nuestra sección 32(*a*)(1)] no contiene referencia expresa al carácter legal o ilegal de los gastos de un negocio que son declarados deducibles. Y el alegato del gobierno en el presente caso expresamente dice que no levanta la contención de que el propósito de las leyes contributivas es penalizar negocios ilegales imponiendo contribución al ingreso bruto en vez de al neto. *Cf. United States* v. *Sullivan*, 274 U.S. 259."

Quizá estos casos de la Corte de Contribuciones y este lenguaje específico de la Corte Suprema sostengan la posición de Krassner. El argumento sería más o menos el siguiente: si no está contra la política pública el permitir deducciones de gastos legítimos en un negocio ilegal, ¿por

qué estaría contra la política pública el permitir deduccio-
nes de gastos legítimos incurridos en una defensa infruc-
tuosa por un contribuyente contra una acusación criminal
relacionada con su negocio? Sin embargo, el análisis de
los hechos de este caso que más adelante exponemos hace
innecesario que decidamos si el contribuyente puede dedu-
cir tales gastos legales. Por tanto, expresamente dejamos
esta cuestión sin resolver.

Esta última cuestión se deja sin resolver porque el pre-
sente caso no envuelve honorarios pagados en una defensa
infructuosa en un caso criminal. Suponemos, sin decidirlo,
que el procedimiento de *quo warranto* aquí envuelto tiene
suficientes aspectos criminales como para justificar su ca-
racterización a nuestros fines como un caso criminal. *Cf.*
*Pueblo* v. *Henneman,* 60 D.P.R. 59, 63–64. Pero el análisis
de este procedimiento en particular no justifica la conclu-
sión de que su resolución fué equivalente o aun análoga a
la convicción en un caso criminal.

El 24 de enero de 1936 El Pueblo de Puerto Rico insti-
tuyó procedimiento de *quo warranto* ante este Tribunal con-
tra esta contribuyente y otras dos entidades alegando una
infracción de la Resolución Conjunta núm. 23 del Congreso,
aprobada el 1ro. de mayo de 1900, 31 Stat. 716, 48 U.S.C.A.
sec. 752, que prohibe a las corporaciones ser dueñas de y
controlar tierras para fines agrícolas en exceso de 500
acres. Entre otras cosas, El Pueblo de Puerto Rico soli-
citaba la cancelación de la franquicia de la Fajardo Sugar
Co., su inmediata disolución, una resolución prohibiéndole
seguir haciendo negocios en Puerto Rico y una multa.

Después de extensos procedimientos preliminares que es
innecesario enumerar aquí, el 18 de junio de 1945 se dictó
una sentencia por consentimiento en este recurso de *quo
warranto.* La sentencia decía que esta Corte tiene juris-
dicción sobre los procedimientos y sobre todas las partes;
que la querella aduce una causa de acción contra las deman-

dadas; y que "al consentir a que se dicte esta sentencia las demandadas no admiten, salvo a los fines de esta sentencia únicamente, cualquier alegación, exposición de hecho o conclusión de derecho contenida en la querella en este caso. Salvo a los fines de esta sentencia solamente, tampoco admiten las demandadas la validez y legalidad de la Ley de Tierras de Puerto Rico."

La sentencia disponía la venta por parte de la Fajardo Sugar Growers Association y Loíza Sugar Company de todas sus tierras de labrantío, fuera de una pequeña porción, a la Autoridad de Tierras, por su justo valor dentro del término de tres años o de cualquier prórroga acordada. Durante este período, la Fajardo Sugar Growers Association tenía derecho a dedicarse a actividades agrícolas en relación con las tierras. Se suspendió el procedimiento de *quo warranto* por un término de tres años o de la prórroga acordada. Si la Autoridad de Tierras decidía no comprar las tierras dentro de este período, entonces se daban por terminadas todas las obligaciones asumidas bajo la sentencia y las partes entonces retornarían a la posición en que estaban antes.

Más adelante disponía la sentencia que "a las demandadas no se les impondrá y éstas no tendrán que pagar, multa, costas, u honorarios de abogado". Finalmente, proveía que "Si y cuando todas las tierras . ... sean vendidas y traspasadas .a la Autoridad de Tierras . . . este recurso y todas las controversias y cuestiones en él envueltas se tendrán como finalmente resueltas por esta Sentencia por Consentimiento y este pleito entonces será archivado."

██ Contrario a la contención del Tesorero de que nada tenemos ante nos que nos permita determinar si la sentencia por consentimiento ha sido cumplida, tomamos conocimiento judicial de los procedimientos posteriores habidos en el recurso de *quo warranto,* que demuestran que la Autoridad de Tierras decidió comprar las tierras envueltas

en la referida sentencia; las partes convinieron el precio de las mismas; y el 5 de junio de 1947 este Tribunal dictó una resolución proveyendo la entrega de las tierras a la Autoridad de Tierras, el pago del precio de venta por la Autoridad a las vendedoras y el otorgamiento de una escritura por éstas a favor de la Autoridad.

No compete a nosotros decir en este momento si la contribuyente hubiera tenido éxito en las numerosas defensas levantadas por ella y por las otras demandadas en el procedimiento de *quo warranto* con anterioridad a la sentencia por consentimiento. Por sus propios motivos, ambas partes decidieron no seguir adelante con estas cuestiones e hicieron del procedimiento de *quo warranto* propiamente dicho, un recurso académico en virtud de su convenio, llevado a cabo, para vender los terrenos en cuestión a la Autoridad de Tierras. No. se admitió responsabilidad, no se impusieron penalidades y no se canceló franquicia corporativa alguna. Las compañías vendieron voluntariamente las tierras a la Autoridad de Tierras a un precio satisfactorio para ellas. Y para este Tribunal nada sustancial queda por hacer con la excepción de dictar una resolución archivando formalmente el procedimiento.

El caso de mayor aplicación al presente es el de *Longhorn Company* v. *Commissioner*, 3 T.C. 310, 148 F.2d 276, denegado el certiorari en 326 U.S. 728, que fué resuelto posteriormente al y a la luz del de *Heininger*. La cuestión en él envuelta era la deducibilidad de (1) honorarios de abogado y (2) sumas pagadas al estado por la demandada en transacción de un pleito del estado para recobrar penalidades por infracción de la ley estatal contra monopolios. La contribuyente pagó la partida (2) como una transacción para evitar el gasto, inconvenientes y publicidad del litigio. La sentencia decía que este pago no debía interpretarse como admisión de violación alguna.

La Corte de Contribuciones admitió la deducción de am-

bas partidas (1) y (2) como gastos necesarios y ordinarios. El Comisionado apeló en cuanto a la partida (2). La Corte de Circuito revocó la decisión de la Corte de Contribuciones en cuanto a dicha partida. Su razonamiento fué que la cuestión básica sobre esta partida no fué la culpabilidad o la inocencia sino más bien que dicha suma fué (pág. 278) "pagada como una penalidad". El permitir su deducción, en consecuencia, sería frustrar una política pública específicamente establecida contra el permitir deducciones de cantidades pagadas como penalidades. Al mismo efecto, *Universal Atlas Cement Company* v. *Commissioner*, 9 T.C. 971. Pero la importancia que tiene para nosotros el caso de *Longhorn* es que aun el Comisionado admitió que los honorarios de abogado eran correctamente deducibles bajo las circunstancias de dicho caso. Se allanó a la decisión de la Corte de Contribuciones en cuanto a la partida (1). Solicitó la revisión de la decisión de la Corte de Contribuciones por la Corte de Circuito solamente en cuanto a la partida (2). Así vemos que si bien la culpabilidad o la inocencia no es determinante en cuanto a las cantidades pagadas como penalidades, el dejar de establecer la culpabilidad de la demandada juega un papel significativo cuando está envuelta la deducibilidad de los honorarios de abogado.

En el procedimiento de *quo warranto* aquí envuelto nunca se estableció la culpabilidad de la compañía. Al gobierno nunca se le pagó dinero alguno en calidad de penalidad. La franquicia corporativa de la contribuyente no fué cancelada y no se le prohibió que continuara haciendo negocios aquí. *Cf. Puerto Rico* v. *Rubert Co.*, 309 U.S. 543. Sin admitir la verdad o la certeza de las infracciones alegadas, las compañías voluntariamente vendieron sus tierras a una agencia gubernativa. Aun en un clásico caso criminal, según hemos visto en el caso de *Longhorn*, el permitir las deducciones de honorarios de abogado pagados al abogado de la defensa, según éstas se distinguen de los

pagos al estado como penalidades transigidas, no "frustraría políticas nacionales o estatales específicamente definidas que proscriben determinados tipos de conducta" cuando el caso se termina sin que haya una convicción o una admisión de la alegada infracción, y los factores que influyeron en la contribuyente a transigir más bien que a litigar constituyen consideraciones prácticas de negocios y no inferencias de culpabilidad. Ese mismo principio se aplica claramente bajo los hechos de este caso y justifica la actuación del Tribunal de Contribuciones al permitir la deducción de honorarios razonables de abogado pagados de buena fe a los abogados que llevaron la defensa de la contribuyente en el procedimiento de *quo waranto* aquí envuelto.

El Tesorero también alega que estos honorarios eran gastos capitalizables y por ende no eran gastos ordinarios del negocio. "Cantidades desembolsadas para proteger y corregir el título de bienes inmuebles no son de ordinario deducibles. Tales erogaciones son consideradas como que constituyen parte del costo de dichos bienes inmuebles. Los pagos hechos en protección de la inversión de capital son desembolsos capitalizables." 4 Mertens, supra, sec. 25.19, págs. 344-45; *Porter Royalty Pool* v. *Commissioner of Internal Rev.*, 165 F.2d 933 (C.C.A. 6, 1948). Los casos citados por el Tesorero son al mismo efecto. *Isaac G. Johnson & Co.* v. *United States*, 149 F.2d 851 (C.C.A. 2, 1945); *Burton-Sutton Oil Co.* v. *Commissioner of Int. Rev.*, 150 F.2d 621 (C.C.A. 5, 1945); *Jones' Estate* v. *Commissioner of Internal Revenue*, 127 F.2d 231 (C.C.A. 5, 1942). Pero El Pueblo nunca ha discutido el título de las compañías a estos terrenos en el sentido técnico. Nunca alegó en el caso de *quo waranto* que si el procedimiento tuviera éxito y las compañías se hubieran visto obligadas a deshacerse de sus tierras, las demandadas no tendrían derecho al valor justo y razonable de las mismas. "Se observará que aun El Pueblo de Puerto Rico, al confiscar o vender en

pública subasta los bienes de la corporación que ha violado la Resolución Conjunta antes mencionada [la Ley de 500 acres], no puede privarla de los bienes sino mediante el pago de la indemnización correspondiente en la forma establecida por la Ley de Expropiación Forzosa." *Campos* v. *Central Cambalache,* 64 D.P.R. 58, 70, confirmado en 157 F. 2d 43 (C.C.A. 1, 1946). En su consecuencia, la disputa no era sobre el título de los terrenos propiamente dichos. Más bien envolvía el derecho de las demandadas a operar un negocio en el cual una de ellas era dueña y controlaba más de 500 acres de tierras de labrantío. Se suplicaba la cancelación de la franquicia de la contribuyente y su disolución. A este respecto el caso es por tanto similar al de *Commissioner* v. *Heininger,* supra, en el que la corte resolvió que los honorarios pagados para hacer frente a un pleito que de tener éxito destruiría el negocio del contribuyente, no eran desembolsos capitalizables y se podían deducir como gastos necesarios y ordinarios. Y véase *Pacific Coast Biscuit Company* v. *Commissioner,* 32 B.T.A. 39.[3]

*La decisión del Tribunal de Contribuciones será confirmada.*

El Juez Asociado Sr. De Jesús no intervino.

---

[3] Aun si resolviéramos que estos honorarios eran desembolsos capitalizables y constituían parte del costo de las tierras, dicho resultado en muy poco beneficiaría al Tesorero. Como hemos visto, estas tierras se vendieron a la Autoridad de Tierras en 1947. La diferencia entre el costo y el precio de venta de las tierras era por tanto aparentemente tributable a las vendedoras en dicho año. Pero si estos honorarios se añadieron al costo de los terrenos, la ganancia tributable producto de la venta sería reducida en esa suma.