CENTRAL IGUALDAD, INC., demandante y recurrida, *v.* SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrente.

Número 11971.

*Reasignado:* 12 de mayo de 1961. *Resuelto:* 20 de junio de 1961.

*José Trías Monge, Secretario de Justicia* y *José A. García Malpica, Procurador Auxiliar,* abogados del recurrente; *Juan A. Faría,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Para los años contributivos a que se contrae el presente pleito, Central Igualdad, Inc. era una corporación íntima (closed corporation) cuyo capital social estaba dividido entre miembros de tres conocidas familias del Oeste de Puerto Rico, unidas por vínculos de consanguinidad y afinidad.(1) En 4 de agosto de 1931 la Junta de Directores de dicha corporación aprobó un acuerdo para conceder una bonificación de cincuenta centavos por cada tonelada de cañas superiores

---

(1) El capital corporativo durante los años 1943 a 1945 estaba representado por 13,000 acciones, distribuidas en la siguiente forma:

| Accionista | Acciones | Proporción |
|---|---|---|
| Alfredo Ramírez de Arellano | 8, 580 | 66. 00% |
| Josefa Bartoli de Ramírez | 39 | 0. 30% |
| Emilia Piñán vda. de Fajardo | 2, 431 | 18. 70% |
| Raquel Fajardo de Ross | 806 | 6. 20% |
| Miguel A. García Méndez | 1, 131 | 8. 70% |
| Alfredo Ramírez de Arellano, Jr. | 13 | 0. 10% |

Los accionistas mencionados tenían una proporción igual del capital social en 1942, aun cuando las acciones emitidas eran solamente 9,000. Aparentemente en 1943 hubo una nueva aportación de capital o se declaró un dividendo en acciones. En 1946 el señor Ramírez de Arellano distribuyó entre sus hijos una parte sustancial de sus acciones.

entregadas durante los meses de diciembre, enero, febrero, mayo y junio de la zafra azucarera por los colonos Alfredo Ramírez de Arellano, Luis A. Fajardo, Alfonso Valdés, Miguel A. García Méndez y Ubaldino Ramírez de Arellano. Este acuerdo obedecía, según la Junta de Directores, a 1) la necesidad de y provecho en moler cañas de componentes ricos durante los meses de diciembre a febrero; y 2) la necesidad de asegurar una molienda ininterrumpida durante los meses de mayo y junio "en evitación de pérdidas para la factoría". Se impuso como condición que las cañas "deben tener un mínimo de 13 de sucrosa y 80 de pureza".(²)

Este acuerdo fue enmendado en la reunión de 6 de diciembre de 1932, y específicamente se limitó la bonificación a las cañas entregadas por *"los directores de esta corporación"* sembradas y cultivadas en fincas propias de *"dichos directores"*. Se facultó además al Presidente de la corporación para que, si ello conviniere a los intereses de la central, otorgare cualquier contrato con *"Directores de esta entidad"* para concederles una "bonificación especial en razón a la fecha de las entregas de las cañas" siempre que la misma no fuere mayor que la reconocida a *"los Directores* que siembren y cultiven dichas cañas en terrenos propios".

Con motivo del fallecimiento del accionista y director Luis A. Fajardo, se tomó un acuerdo en 19 de agosto de 1941 que lee en parte: "El señor García Méndez propone que habiendo tenido el ex-Vice Presidente Sr. Luis A. Fa-

---

(²) Posteriormente, la Junta de Directores, al referirse a este acuerdo en la reunión celebrada en 6 de diciembre de 1932, dijo en el acta correspondiente:

"Consta en acta, como una resolución de esta Junta el acuerdo de bonificar con una prima de cincuenta (50) centavos a los Directores de esta Corporación que entreguen cañas de componentes ricos para ser molidas en los meses de Enero y Febrero, de las clases 'Rayada', 'Santa Cruz', 'B y C 10/12', 'P. O. J. 27/25' y cualquiera otra conocida como superior, y así mismo bonificar con una prima de cincuenta (50) centavos por todas las entregadas durante los meses de Mayo y Junio. Todo ello con el fin de conceder un incentivo para la entrega de cañas en dichas épocas en forma tal que pueda ser sostenido el cupo de molienda."

48

jardo el *privilegio de las bonificaciones* concedidas a oficiales de esta compañía, se consideren las cañas de doña Raquel Fajardo de Ross (hija del extinto) con igual grado de derecho a la referida bonificación durante los meses a que se contrae la concesión, siendo como son parte de las mismas cañas que tenía antes el oficial Sr. Fajardo". No fue necesario tomar igual acuerdo en cuanto a las cañas de doña Emilia Piñán, cónyuge viuda de don Luis A. Fajardo, porque había sido designada Vice Presidenta en lugar de su fenecido esposo, y como tal directora estaba cubierta por las disposiciones de los acuerdos generales de 1931 y 1932 a que hemos hecho referencia.

De conformidad con los acuerdos reseñados la corporación hizo pagos de bonificaciones durante los años 1942 a 1946, (³) según se detalla a continuación, que luego reclamó en sus declaraciones de ingresos como un gasto "ordinario y necesario" de la explotación de su negocio.

| 1942 | $27,815.53 | 1945 | $19,069.77 |
| 1943 | $19,045.31 | 1946 | $20,705.51 |
| 1944 | 4,277.85 | | |

Los beneficiarios de las bonificaciones durante estos años fueron los señores Alfredo Ramírez de Arellano, Miguel A. García Méndez, Alfredo Ramírez de Arellano, Jr., Emilia Piñán vda. Fajardo, los esposos A. J. Ross y Raquel Fajardo de Ross, J. A. B. Nolla, Frank Phillippi y unas empresas agrícolas conocidas como Comunidad Sabanetas, Comunidad Ibern, Comunidad Altagracia y Finca Hau. Estas empresas agrícolas eran sociedades constituidas entre los mismos directores y accionistas de Central Igualdad, Inc. que arrendaban determinadas extensiones de terreno y los dedicaban a la siembra y cultivo de cañas de azúcar.

---

(³) A pesar de que los acuerdos autorizaban una bonificación a razón de cincuenta centavos por tonelada de caña entregada, se calculó solamente a base de veinticinco centavos por tonelada. La bonificación del año 1944 ascendente a $4277.85 se pagó en 1945.

El Tribunal Superior, Sala de San Juan, sostuvo la posición de la corporación contribuyente al efecto de que estas bonificaciones eran deducibles como gastos ordinarios y necesarios del negocio, ya que este plan no tuvo otro propósito "que no fuera el de asegurar la estabilidad económica y buen funcionamiento de su central". Entre otras cosas, dijo dicho tribunal:

"La Central Igualdad, operada por la corporación demandante, fue fundada allá para el año 1925. Debido a su capacidad limitada de producción y a los precios bajos prevalecientes para el azúcar en el año 1932 el negocio estaba languideciendo. La Junta de Directores consideró que la mejor manera de eliminar las pérdidas habidas en años anteriores y de convertirlas en beneficio en los posteriores, era aumentando el volumen de caña a ser molida en cada zafra, para de ese modo reducir los costos de elaboración por quintal de azúcar, al diluir sus gastos fijos, sin tener que aumentar la capacidad diaria de molienda, ya que para esto era necesario hacer una inversión cuantiosa en ampliación de molino y de otras facilidades fabriles que la demandante no estaba entonces en condiciones de afrontar, porque durante los años inmediatamente precedentes las utilidades del negocio habían sido exiguas y el precio del azúcar en aquellos momentos era muy bajo. Estas circunstancias no justificaban dicha inversión, aparte de que se hacía difícil conseguir financiamiento de instituciones bancarias para tales fines.

"Para instrumentar la mencionada solución al problema la demandante decidió que lo práctico era extender su período de zafra comenzando en diciembre y continuando hasta julio, aun cuando ello significara el moler en aquellos meses que fueron de menor rendimiento. Los miembros de la Junta de Directores consultaron a los colonos y se percataron de que éstos preferían moler durante los meses de mayor rendimiento, que son, de acuerdo con la prueba presentada, los comprendidos desde mediados de febrero hasta mediados de mayo. Considerando la actitud de los colonos los Directores acordaron entonces moler ellos mismos tanta caña como fuese necesario de la producida en sus fincas individuales para completar el cupo de molienda normal de la central durante los meses de menor rendimiento, o sea desde diciembre hasta mediados de febrero, y desde mediados de mayo hasta finalizar la zafra en junio o

julio, a base de que la central les pagara una compensación o bonificación de 25¢ por cada tonelada de caña molida que diera un rendimiento total menor del mínimo estipulado entre ellos y la demandante. Este plan fue continuado consecuentemente en años subsiguientes con ligeras variaciones, tales como aumentar la bonificación a ser pagada por tonelada de caña así molida y hacer el plan extensivo tanto a todos los colonos accionistas aun cuando estos no fueren directores, como a todos aquellos colonos particulares que estuviesen dispuestos a comprometerse a entregar suficiente caña para completar el mencionado cupo normal de molienda en los meses de bajo rendimiento.

" *　　*　　*　　*　　*　　*　　*　　*

"La prueba demuestra además que tampoco han sido pagos de privilegio concedidos a los colonos accionistas sean éstos directores o no como ha sido la posición adoptada por el demandado desde que comenzó a desfilar la prueba de este caso, puesto que la evidencia es al efecto de que la demandante estuvo dispuesta a concederle igual bonificación a los colonos como accionistas, y éstos prefirieron moler sus cañas sólo en los meses de mayor rendimiento, renunciando a dicha bonificación."

La sección 32(a) (1) de la Ley de Contribuciones sobre Ingresos de 1924 (13 L.P.R.A. sec. 735(a) (1)) permite a una corporación, al computar su ingreso neto, deducir "todos los gastos ordinarios y necesarios pagados o incurridos durante el año contributivo en la explotación de cualquier industria o negocio". Por supuesto, no existe una fórmula infalible para determinar cuándo un gasto se considerará ordinario y necesario. *Welch* v. *Helvering*, 290 U.S. 111, 115 (1933); *What expenses are "ordinary and necessary" within meaning of income tax laws permitting deduction of ordinary and necessary business expenses*, 84 L. Ed. 426 (1940). En relación con este problema es necesario recordar dos reglas básicas: 1) que las deducciones, por constituir una gracia legislativa, deben interpretarse en forma restrictiva. *Clínica Juliá* v. *Secretario de Hacienda*, 76 D.P.R. 509 (1954); *Descartes* v. *Tribunal de Contribuciones y Ortiz*, 73 D.P.R. 491 (1952); *Buscaglia* v. *Tribunal*

*de Contribuciones*, 67 D.P.R. 585 (1947), confirmado en 168 F.2d 401 (1948); *Fifth Ave. Coach Lines, Inc.* v. *Commissioner*, 281 F.2d 556 (C.A. 2, 1960); *Long* v. *Commissioner*, 277 F.2d 239 (C.A. 8, 1960); *Northern Natural Gas Co.* v. *O'Malley*, 277 F.2d 128 (C.A. 8, 1960); véase, Griswold, *An Argument Against the Doctrine That Deductions Should be Narrowly Construed as a Matter of Legislative Grace*, 56 Harv. L. Rev. 1142; 2) que corresponde al contribuyente establecer su derecho a la deducción reclamada. *Radom & Neidorff, Inc.* v. *United States*, 281 F.2d 461 (Ct. Cl. 1960). Tres condiciones deben cumplirse para que pueda permitirse esta deducción: *a*) que el gasto se incurra en el curso de un negocio; *b*) que sea un gasto necesario y ordinario; y, *c*) que se pague o incurra dentro del año contributivo. Mertens, *Laws of Federal Income Taxation*, Vol. 4, sec. 25.07.

Los requisitos de que el gasto sea ordinario y necesario deben coexistir. Mertens, *op. cit.*, 25.09. Se ha definido como necesario cualquier gasto que ayuda en el desarrollo, fomento y continuación del negocio, *Anthony Trading Corp.* v. *Commissioner*, 65 F.2d 583 (C.C.A. 2, 1933) comentado en nota en 47 Harv. L. Rev. 1209, 1264 (1934), pero ello no implica que tenga que ser indispensable, sino que basta con que haya razonable conexión con el propósito de fomentar el negocio. *Commissioner* v. *Pacific Mills*, 207 F.2d 177 (C.A. 1, 1953); *Schomburg* v. *Tesorero*, 6 D.T.C. 24 (1949). Es un gasto ordinario cuando generalmente prevalece en la comunidad como una práctica en el negocio, *Lilly* v. *Commissioner*, 343 U.S. 90 (1952); *Deputy* v. *du Pont*, 308 U.S. 488 (1940); *Bing* v. *Helvering*, 76 F.2d 941 (C.C.A. 2, 1935); cf. *Schomburgh* v. *Tesorero*, supra. Otro factor a considerarse es la relación existente entre la persona o entidad que incurre en el gasto y la que recibe el pago. *Jesse E. Hall, Sr.* v. *Commissioner*, 32 T.C. 390 (1959); cf. *Clínica Juliá* v. *Secretario*, 76 D.P.R. 509, 530 (1954). Cada

caso debe ser resuelto a la luz de sus hechos particulares. Así se ha hecho por este Tribunal en varias ocasiones [4] y por el extinto Tribunal de Contribuciones. [5]

La contribuyente apelada nos ha presentado este recurso como el ejemplo típico del caso en que está envuelto un simple conflicto de prueba que fue resuelto a su favor. Pacientemente nos ha señalado ciertas páginas de la transcripción de evidencia que aparentemente sostienen las determinaciones del juez de instancia. Pero en verdad, la cosa no es tan sencilla. Como cuestión de realidad, el testimonio principal de los testigos aparece contenido en varias piezas de evidencia documental que fueron admitidas en el curso de la vista. Sus declaraciones estuvieron más bien dirigidas a explicar el contenido de esta prueba documental. El resto de sus testimonios no arrojó gran luz sobre el problema fundamental envuelto, o sea, sobre la deducibilidad, como gasto ordinario y necesario, de las bonificaciones concedidas a los colonos accionistas. Reiteradamente hemos resuelto que en cuanto se refiere a la apreciación de prueba documental nos encontramos en las mismas condiciones que el tribunal sentenciador y nos hemos negado a extenderle en forma incalificada el palio de inmunidad que generalmente prodigamos a determinaciones fundadas en la apreciación de prueba oral. *Castro* v. *Meléndez,* ante pág. 573 (1961); *Feliciano* v. *Sundem,* 78 D.P.R. 1, 6 (1955); *Luce & Co.* v. *Cianchini,* 76 D.P.R. 165, 169 (1954); Regla 43.1 de las de Procedimiento Civil de 1958; cf. *Sanabria* v. *Sucn. González,* ante pág. ... (1961).

---

[4] *Buscaglia* v. *Tribunal Contribuciones,* 68 D.P.R. 858 (1948); *Descartes, Tes.* v. *Tribl. Contribuciones y Ortiz,* 73 D.P.R. 491 (1952); *Valdés* v. *Tribl. Contribuciones y Tesorero, Int.,* 71 D.P.R. 716 (1950); *Buscaglia, Tes.* v. *Tribl. Contribuciones y Giusti,* 70 D.P.R. 846 (1950).

[5] *Schomburg* v. *Tesorero,* 6 D.T.C. 24 (1949); *Corporación Saurí & Subirá* v. *Tesorero,* 5 D.T.C. 873 (1947); *Santiago* v. *Tesorero,* 5 D.T.C., Supl., 11 (1948); *Antonio Roig Sucrs., S. en C.* v. *Tesorero,* 4 D.T.C. 919 (1946); *South Porto Rico Sugar Co.* v. *Tesorero,* 3 D.T.C. 575 (1946); *Yabucoa Sugar Co.* v. *Tesorero,* 2 D.T.C. 257 (1945).

Hemos considerado con gran detenimiento la prueba pre-sentada y, a nuestro juicio, la misma establece varios hechos de especial significación que nos inclinan a resolver el problema planteado en forma adversa a la corporación contribuyente. No hay la menor duda de que la bonificación acordada se concedió únicamente a los colonos directores o a personas tan íntimamente relacionadas con éstos que para todos los efectos prácticos es como si se tratara de las mismas personas. La demandante falló en establecer que el mismo tratamiento se ofreció a los colonos particulares que entregaban cañas durante los meses inapropiados. A este respecto es significativo que no se produjo el testimonio—tan fácilmente accesible—de uno solo de los colonos particulares para corroborar la ingenua versión de que se rechazó por ellos una concesión de veinticinco centavos por tonelada de caña, a pesar de que calificaban para obtener tal beneficio.(⁶) Por otro lado, el texto del acuerdo original, y sus modificaciones posteriores, claramente evidencian que se intentó únicamente beneficiar a los colonos relacionados con la empresa. Tanto es así que cuando falleció uno de los principales accionistas y directores se hizo necesario enmendar el acuerdo para hacerlo extensivo a una de sus herederas, que no pertenecía a la junta de directores. También llamó nuestra atención que, ante la realidad de que varios colonos particulares eran acreedores a la bonificación a base del fac-

---

(⁶) Se intentó establecer que los colonos Carlos Padovani y Domingo Bonet Santos recibieron la referida bonificación, pero el resultado final de la evidencia presentada fue que se trataba de ciertas partidas consideradas como bonificaciones para los fines de contabilidad, y que en verdad se referían a diferencias en las liquidaciones de las cañas entregadas o a compensación especial por el arrimo de las cañas a la central. En ninguno de los casos se trataba específicamente de la aplicación de los acuerdos de 1931 y 1932, sino que obedecieron a relaciones contractuales particulares existentes entre la central y estos colonos. Además, el Exhibit 2 de la propia querellante demuestra que las cantidades pagadas por concepto de esta bonificación, que se reclaman como deducción, fueron satisfechas a los colonos relacionados exclusivamente.

tor originalmente considerado, se intentó inyectar como condición adicional para calificar a los fines de recibir la bonificación, otro factor que no se hizo constar expresamente en el acuerdo que figura en las actas, cual es, que el colono comenzara y terminara moliendo con la central, esto es, que entregara cañas durante todo el período de la zafra. Este requisito adicional es de muy difícil cumplimiento, a menos que se trate de colonos que muelen un gran tonelaje. Sin embargo, la prueba demuestra que varios colonos particulares también calificaban a este respecto.[7] También debe tenerse en cuenta que las limitaciones de producción de más del noventa porciento de los colonos particulares[8] les excluía de inmediato de calificar para obtener la bonificación a base del cumplimiento de los dos factores apuntados, o sea, entrega de cañas durante los meses inapropiados y durante todo el período de molienda.

La prueba demuestra que, si bien es cierto que los colonos particulares entregaron una proporción mayor de toneladas durante los meses apropiados de marzo y abril que la relación que guarda su tonelaje total entregado durante la zafra con el tonelaje total molido por la central, la diferencia no es de tal consideración que justifique la erogación de la bonificación que se reclama como gasto ordinario y necesario.

---

[7] Del exhibit H del querellado surge que los siguientes colonos entregaron cañas durante todo el período de molienda: 1942:—Carlos Padovani, Juan Alemany Sosa, Doroteo Esteves, José Ramírez Rivera y Alfonso Lugo Rodríguez; 1943:—Pedro Rullán Rullán; 1944:—Ana María Sugar Co., Juan Alemany Sosa, Domingo Bonet, Antonio Santos y José Ramírez Rivera; 1945:—Ana María Sugar Co., Juan Alemany Sosa, Carlos Padovani, Juan Esteves Gómez, Picó Hermanos, Domingo Bonet, Alfonso Lugo Rodríguez, Evangelista González, Pedro Rullán Rullán y José Ramírez Rivera; 1946:—Carlos Padovani.

[8] Según el testimonio de uno de los testigos presentados por la contribuyente, la producción de los colonos particulares era aproximadamente como sigue:

| | | | |
|---|---|---|---|
| 1 a 50 toneladas | 40% | 200 a 500 toneladas | 10% |
| 50 a 100 toneladas | 20% | 500 a 1,000 toneladas | 4% |
| 100 a 200 toneladas | 20% | Más de 1,000 toneladas | 6% |

(Véanse, las tablas 1 a 4 del apéndice de esta opinión.) * Si algo revela la prueba es que los colonos directores arrimaron prácticamente el mismo tonelaje que les hubiese correspondido bajo un sistema de entrega proporcional ideal según esbozado por uno de los directores.

Según demostró el testigo Juan J. Gómez, cuya declaración sobre este extremo no fue contradicha en forma alguna, con excepción del año 1945, el plan de arrimo puesto en práctica por la Central Igualdad resultó en un rendimiento mayor en quintales de azúcar producidos que el sistema de arrimo proporcional.(⁹)    (Véase la tabla núm. 5 del apéndice de esta opinión.)

Finalmente, es curioso que el resultado neto de las bonificaciones pagadas a los colonos relacionados fue que éstos obtuvieron un promedio mayor de ingreso por quintal de azúcar producida que los colonos particulares, aparentemente favorecidos por moler la mayor parte de su cosecha durante los meses de marzo y abril.    (Véase la tabla Núm. 6 del apéndice de esta opinión.)

La prueba de la corporación querellante no estableció tampoco que esta práctica de conceder bonificaciones se utilice por otras empresas en parecidas circunstancias.   Sabido es que en la mayoría de las centrales de Puerto Rico, sino en todas, el período de zafra se extiende no menos de cinco meses.   Parece ineludible la conclusión de que estas bonificaciones no son más que pagos de privilegios a los colonos directores y accionistas, y que como tales, no constituyen

---

(⁹) La prueba de la querellante tendió a demostrar que la bonificación a los colonos relacionados constituía un incentivo para que estos enviaran sus cañas durante los meses inapropiados o sea, los de menor rendimiento, ya que los colonos particulares insistían en moler durante marzo y abril. Debido a que la central no podía, por limitaciones de capacidad de molienda, disponer de toda la caña durante estos dos meses, era necesario iniciar la molienda en diciembre o enero y terminarla en mayo o junio. Para evitar este "perjuicio" a los colonos relacionados que enviaban sus cañas durante toda la zafra, la única otra alternativa hubiese sido el sistema de arrimo proporcional.

gastos ordinarios y necesarios del negocio, sino que son una forma de distribuir beneficios.([10])  Es obvio que si se aceptaran como gastos ordinarios y necesarios ello reduciría el ingreso neto de la corporación, y por ende, su responsabilidad contributiva.  En cuanto a los beneficiarios, la situación no varía considérese como una distribución o como una bonificación, porque en ambos casos forma parte de su ingreso bruto.

Para sostener que no se trata de un pago de privilegio o una distribución de dividendos, indica la apelante que "no existe identidad proporcional alguna entre el por ciento de acciones poseídas por cada uno de los colonos accionistas con el total de acciones emitidas por la demandante y el por ciento de lo pagado en concepto de bonificaciones (sic) a cada accionista y el total de lo pagado por ese concepto". Sin embargo, la ausencia de esta proporción matemática no es decisiva, ya que una distribución puede considerarse como un dividendo aunque no haya mediado una acción formal de la junta de directores en cuanto a su declaración, o la distribución no sea en proporción al interés de cada accionista en el capital corporativo, y aun cuando haya accionistas que no participen en la distribución. *Jaeger Motor Car Co.* v. *Commissioner*, 284 F.2d 127, 134 (C.A. 7, 1960) ; *Simon* v. *Commissioner*, 248 F.2d 869, 875 (C.A. 8, 1957) ; *Lengsfield* v. *Commissioner*, 241 F.2d 508, 511 (C.A. 5, 1957) ; *Paramount-Richards Theatres, Inc.* v. *Commissioner*, 153 F.2d 602, 604 (C.A. 5, 1946) ; *Disguised Dividends: A Comprehensive Survey*, 3 U.C.L.A.L. Rev. 207 (1956).  Se han considerado como dividendos o distribución de beneficios pagos de regalías (royalties) a accionistas para facilitar la continuación de las actividades corporativas, *Paramount-*

---

([10]) Precisamente, cuando no podía anticiparse esta controversia, se caracterizó estos pagos como *"privilegio* de las bonificaciones". (Véase acta de 19 de agosto de 1941.)  La explicación que de este hecho ofreció uno de los directores dista mucho de ser satisfactoria.

*Richards Theatres, Inc.* v. *Commissioner,* supra; *Ingle Coal Corporation* v. *Commissioner,* 174 F.2d 569 (C.A. 7, 1949).

En *Cleveland Shopping News Co.* v. *Routzahn,* 89 F.2d 902 (C.C.A. 6, 1937) una corporación que se dedicaba al negocio de publicaciones distribuyó entre sus accionistas parte de un fondo de garantía acumulado durante dos años. La distribución se hizo en proporción a las sumas invertidas por los accionistas en acciones durante dicho período, irrespectivamente del número de acciones poseídas. Se rechazó la posición de la contribuyente al efecto de que se trataba del pago de incentivos para lograr un número mayor de accionistas, y se dijo que lo procedente era considerar estos pagos como dividendos o distribución de beneficios. "Es cierto que no se trataba de una distribución en proporción al capital social poseído, pero todos los beneficiarios eran accionistas y acordaron que la distribución se hiciese en proporción a la contribución individual de cada accionista al fondo." Véanse, *Associated Grocers of Alabama* v. *Willingham,* 77 F.Supp. 990 (Ala. 1948); *Peoples Gin Co., Inc.* v. *Commissioner,* 118 F.2d 72 (C.C.A. 5, 1941); *Juneau Dairies, Inc.* v. *Commissioner,* 44 B.T.A. 759 (1941). En el presente caso se trata de una distribución a base de las toneladas de caña entregadas.

Aun cuando pueden existir casos en que pagos o bonificaciones a accionistas únicamente pueden considerarse como gastos ordinarios y necesarios, las circunstancias que concurren aquí y que hemos expuesto, nos llevan a la conclusión de que se trata de distribución de beneficios.

*En razón de todo lo expuesto, se revocará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en 16 de diciembre de 1952.*

El Juez Asociado Sr. Santana Becerra no intervino.

58

*TABLA NUM. 1—Demostrativa de las Toneladas de Caña Molida en Central Igualdad, Inc. durante los Años 1942 a 1946 por los Colonos Accionistas, los Colonos Particulares y la Central

| Año | Molienda Total | Colonos Accionistas | Proporción | Central | Proporción | Colonos Particulares | Proporción |
|---|---|---|---|---|---|---|---|
| | | | Por ciento | | Por ciento | | Por ciento |
| 1942... | 356, 251. 22 | 225, 419. 79 | 63. 27 | 7, 124. 96 | 2. 00 | 123, 706. 77 | 34. 73 |
| 1943.. | 316, 451 | 180, 291 | 56. 97 | 4, 430 | 1. 40 | 131, 730 | 41. 63 |
| 1944... | 209, 830 | 128, 289. 1 | 61. 46 | 3, 557. 8 | 1. 70 | 76, 891. 6 | 36. 84 |
| 1945... | 305, 687 | 171, 836 | 56. 22 | 2, 869 | 0. 96 | 130, 982 | 42. 82 |
| 1946... | 332, 315 | 194, 584 | 58. 55 | 2, 471 | 0. 74 | 135, 260 | 40. 71 |

'TABLA NUM. 2—Demostrativa de las Toneladas de Caña Molida durante los Meses de Marzo y Abril durante los Años 1942 a 1946 por los Colonos Accionistas y los Colonos Particulares

| Año | Total Cañas Entregadas | Colonos Accionistas | Proporción | Colonos Particulares | Proporción |
|---|---|---|---|---|---|
| | | | Por ciento | | Por ciento |
| 1942.......................... | 122, 631. 88 | 65, 306. 41 | 53. 56 | 57, 325. 47 | 46. 43 |
| 1943.......................... | 124, 929. 69 | 66, 302. 725 | 53. 30 | 58, 626. 965 | 46. 70 |
| 1944.......................... | 107, 612. 432 | 64, 554. 44 | 60. 43 | 43, 057. 995 | 39. 57 |
| 1945.......................... | 85, 783. 325 | 44, 906. 96 | 52. 97 | 40, 876. 365 | 47. 03 |
| 1946.......................... | 126, 418. 39 | 64, 276. 145 | 51. 05 | 62, 142. 245 | 48. 95 |

TABLA NUM. 3—Demostrativa de la Proporción de las Toneladas de Caña Molida por los Colonos Particulares Durante los meses de Marzo y Abril

| Año | Total Cañas Colonos Particulares | Caña Molida en Marzo y Abril | Proporción |
|---|---|---|---|
| | | | Por ciento |
| 1942................. | 123, 706. 77 | 57, 325. 47 | 46. 36 |
| 1943................. | 131, 730 | 58, 626. 965 | 44. 46 |
| 1944................. | 76, 891. 6 | 43, 057. 995 | 55. 88 |
| 1945................. | 130, 982 | 40, 876. 365 | 30. 75 |
| 1946................. | 135, 260 | 62, 142. 245 | 45. 94 |

TABLA NUM. 4—Comparativa de la Proporción de Caña Molida por Colonos Particulares en Zafras 1942 a 1946, y Caña Molida Durante Meses de Marzo y Abril de dichos Años

| Año | Proporción de Cañas Colonos Particulares | Proporción de Caña Molida Marzo y Abril | Diferencia |
|---|---|---|---|
| | Porcientos | Porcientos | Porcientos |
| 1942.............. | 34.73 | 46.435 | 11.705 |
| 1943.............. | 41.63 | 46.70 | 5.07 |
| 1944.............. | 36.84 | 39.57 | 2.73 |
| 1945.............. | 42.82 | 47.03 | 4.21 |
| 1946.............. | 40.71 | 48.95 | 8.24 |

TABLA NUM. 5—Demostrativa de las Diferencias entre el Sistema de Arrimo Bonificado y el Sistema de Arrimo Proporcional en cuanto Respecta al Rendimiento Final para los Colonos Relacionados y los Colonos Particulares

| Año | Arrimo Bonificado | Arrimo Proporcional | Incremento a Bonifi. | Incremento Colonos Directores | Incremento Central | Incremento Colonos Particulares |
|---|---|---|---|---|---|---|
| | Quintales | Quintales | Quintales | Quintales | Quintales | Quintales |
| 1942........ | 840.303 | 835,717 | 4,786 | 1,230 | 120 | 3,436 |
| 1943........ | 768,572 | 762,325 | 6,247 | 4,082 | (9) | 2,174 |
| 1944........ | 515,451 | 515,134 | 317 | (432) | (85) | 834 |
| 1945........ | 713,925 | 719,134 | (5,209) | (2,769) | (153) | (2,287) |
| 1946........ | 805,239 | 804,917 | 322 | (3,668) | (41) | 4,031 |

TABLA NUM. 6 — Comparativa del Promedio de Ingreso por Quintal de Azúcar Producida por los Colonos Relacionados y los Colonos Particulares

| Año | Colonos Relacionados | Bonificación | Total | Colonos Particulares | Diferencia |
|---|---|---|---|---|---|
| 1942................ | $2.213964 | $0.05119975 | $2.26516376 | $2.23967706 | $0.0254867 |
| 1943................ | 2.09605629 | 0.04282232 | 2.13887861 | 2.08793256 | 0.0594605 |
| 1945................ | 2.09198665 | 0.01916208 | 2.11114873 | 2.09903193 | 0.12111680 |
| 1946................ | 2.26709393 | 0.07773258 | 2.34482651 | 2.30042988 | 0.04439663 |